UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARISSA NYPL, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>CRISIS PREVENTION INSTITUTE,<br><br>　　　　Defendant. | Case No. 16-cv-04956-JSC<br><br>**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 37 |

Plaintiffs Marissa Nypl and Vladimir Nypl (together, "Plaintiffs") sued Defendant Crisis Prevention Institute, Inc. ("CPI") in state court for negligence and loss of consortium stemming from an injury sustained by Ms. Nypl during an advanced physical training course conducted by CPI.[1] CPI removed the action to this Court pursuant to 28 U.S.C. § 1441(b), based on diversity jurisdiction. (Dkt. No. 1.)[2] Now pending is Defendant's motion for summary judgment. (Dkt. No. 37.) After careful review of the parties' briefing, and having had the benefit of oral argument on September 13, 2018, the Court DENIES Defendant's motion. There is a genuine dispute as to (1) whether the alleged conduct was outside the range of the ordinary activity inherent in the training exercise, and (2) was an extreme departure from the ordinary standard of conduct.

**BACKGROUND**

**I.　The Parties**

Marissa Nypl was employed as a licensed psychiatric technician with Butte County Behavioral Health ("Butte County") and certified CPI training instructor from 2010 until June

---

[1] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 10 & 13.)
[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

2015. (Dkt. No. 37-3, Ex. B at 14:15-22; 16:9-17:7; 28:20-22.) Ms. Nypl is not currently employed. (Dkt. No. 38-2, Ex. 6 at 176:17-18.) Vladimir Nypl is Marissa's Nypl's spouse. (Dkt. No. 1 at 13.)

CPI is an international organization that conducts training programs for human service professionals. (Dkt. No. 37-2 at ¶¶ 2-4.) "California hospitals and psychiatric institutions use CPI's courses to ensure compliance with the State of California's workplace requirement for violence prevention training." (*Id.* at ¶ 6.) "CPI offers Instructor Certification Courses that allow human service professionals to become certified to teach the Nonviolent Crisis Intervention ("NCI") program." (*Id.* at ¶ 4.) An NCI-certified instructor "can then attend more advanced courses such as the Applied Physical Training ("APT") program." (*Id.* at ¶ 5.) Certified instructors must take a new CPI class every four years to maintain their certification, and may choose "from a menu of different classes." (Dkt. No. 37-3, Ex. B at 31:6-17.)

## II. Factual Background

### A. Marissa Nypl's Duties of Employment and CPI Certification

Patients assigned to Butte County are treated for various mental health issues, including "[b]ipolar disorder, schizophrenia, addiction, personality disorders, [and] depression." (Dkt. No. 37-3, Ex. B at 17:10-11.) In her role as a licensed psychiatric technician ("technician") at Butte County, Ms. Nypl assisted patients in their activities of daily living, disbursed medication, and dealt with "assault[s]," and "out of control, angry, upset . . . and sad people." (*Id.* at 18:14-20.) Ms. Nypl was also responsible for monitoring the training of other staff members at Butte County, and ensuring that staff completed state-mandated training requirements. (*Id.* at 19:12-21:1.) As a CPI-certified instructor, Ms. Nypl also taught in-house CPI classes. (*Id.* at 19:15-22.)

Ms. Nypl attained her CPI instructor certification in 2010. (*Id.* at 14:15-22.) To maintain her certification, Ms. Nypl was required to take another CPI course in 2014. (*Id.* at 31:6-11.) CPI offered a menu of advanced courses. (*Id.* at 15-20.) Ms. Nypl's supervisor suggested that she take the APT course because Ms. Nypl's unit was experiencing "an increase in violence," and patients were "getting more volatile." (*Id.* at 32:18-25.) Ms. Nypl elected to attend the course "to get a little more advanced physical training." (*Id.* at 30:11-12.)

### B. The APT Course

The APT course is an advanced course that "mimics real life situations," including "special circumstances and emergency situations." (Dkt. No. 37-2 at ¶¶ 7-8.) Participants "are cautioned about the risk of injury." (Dkt. No. 37-2 at ¶ 8.) Ms. Nypl was aware that the course "was more physically advanced" than her initial CPI certification class in 2010. (Dkt. No. 37-3, Ex. B at 29:18-25.) Course participants must "sign a Release and Waiver before participating." (Dkt. No. 37-2 at ¶ 8.) The Release and Waiver ("Waiver") states, in pertinent part:

> I realize that certain CPI training programs require all participants to engage in extensive practice and physical intervention skills. These programs may include exercises that involve repetitive drills that include
>
> - Frequent stretching, kneeling, and bending
> - Extended periods of standing
> - Moving from kneeling positions to standing positions
> - Multiple, repeated movements requiring good stamina and strength
> - Real-time simulation of physical activity requiring a high degree of exertion and coordination

(Dkt. No. 37-2, Ex. 1 at 5.) The waiver further states that the signatory "waives and releases":

> any and all claims and causes of action which I may have or acquire against CPI, its successors, assigns, and all other persons, firms, corporations, associations, or partnerships associated with them, from any and all liability related to any loss, damage, or injury (including death), sustained by me, whether known or unknown, resulting or to result from my participation in the training program.
>
> It is my desire that in addition to a Release of All Claims, this document shall be deemed to be a Covenant Not to Sue CPI successors, assigns, and all other persons, firms, corporations, associations, or partnerships associated with them, on account of any damage or injury of whatever nature incurred by me as a result of my participation in the training program.

(*Id.*) Ms. Nypl signed the Waiver on May 28, 2014. (*Id.*); (*see also* Dkt. No. 37-3, Ex. B at 39:22-24.) The APT course was conducted over a three-day period, from May 28, 2014 to May 30, 2014. (Dkt. No. 37-3, Ex. B at 45:25.)

### C. Transport Position

CPI training materials describe the transport position as a maneuver used to "safely mov[e] an individual who is beginning to regain control." (Dkt. No. 38-2, Ex. 10 at 184.) CPI instructs:

3

> Prior to moving an individual, assist the person into a more upright position and remove your hand from the individual's shoulder. Reach under the individual's arm to grab their own wrist. This cross-grain grip better secures the individual between staff during transport. Remove your leg from directly in front of the individual prior to transport while maintaining close body contact.
>
> It is not recommended to transport an individual who is struggling. If necessary, return to the CPI Team Control Position if the individual's and/or staff's safety is at risk.

(*Id.*) This instruction reflects how the transport position "was taught in 2014." (Dkt. No. 38-2, Ex. 4 at 99:5-7.)

### D. May 29, 2014 APT Course

On or about May 29, 2014, Ms. Nypl participated in the APT course with two coworkers, Latonya Williams and Marshal Woodward. (Dkt. No. 37-3, Ex. B at 32:8-10.) Ms. Williams and Mr. Woodward are also CPI-certified instructors. (*Id.*) CPI provided two instructors ("Instructors") for the APT course. (*Id.* at 38:22-24.)

#### 1. Events According to Marissa Nypl

On the second day of the APT course, participants engaged in an exercise applying the transport position. During the exercise, Ms. Nypl and Ms. Williams were required to simulate the transport of a mock patient, an individual identified as "Brian." (*Id.* at 42:1-6.) Ms. Nypl and Ms. Williams were familiar with the transport hold, and Ms. Williams informed the instructor that technicians at Butte County were trained to not "let go in a transport hold [without communicating to their partner] because it's dangerous." (*Id.* at 42:16-19).

The exercise required Ms. Nypl and Ms. Williams to walk on either side of Brian with one arm interlinked with Brian's arm. (*Id.* at 43:3-5.) Ms. Nypl, standing to the right of Brian, interlinked her left arm with Brian's right arm, and Ms. Williams interlinked her right arm with Brian's left arm. (*Id.*)

Ms. Nypl and Ms. Williams were instructed to use the transport hold and walk Brian from one wall of the room to the opposite wall.[3] (*Id.* at 42:3-6.) They proceeded to do so for a few feet,

---

[3] The three were in position "a few feet" from the starting wall. (Dkt. No. 37-3, Ex. B at 44:20-25.) Ms. Nypl estimates that the distance between her starting position and the opposite wall was "about 20 feet probably." (Dkt. No. 38-2, Ex. 6 at 164:20.)

4

"walking at normal speed." (*Id.* at 42:6-8.) An Instructor then "ran up behind [them] and pushed all three . . . at full speed towards the [opposite] wall," which contained a plate glass window. (*Id.* at 42:11-13.) Ms. Nypl believes the Instructor "might have said something" as a "signal or alert" prior to the push, but could not recall the exact details.[4] (Dkt. No. 40-1, Ex. 1 at 9:7-14.) As they approached the wall, Brian lifted his feet and "kick[ed] off the wall, thrusting [them] all backward." (Dkt. No. 37-3, Ex. B at 43:9-10.) Ms. Nypal's arm was "still interlocked with [Brian's]" as they were "jostled backwards," and she felt her arm "pop." (*Id.* at 43:9-21.)

Ms. Nypl recalls:

> I felt like there was a pop in my arm and I was just, like, oh, okay. I'm going to have to take some ibuprofen tonight and just shake it off because that's just the way we do things in psych and in the courses. You expect to feel a little bit of muscle soreness the next day, so I didn't think much of it at the time. I knew I had pain, but I figured it would subside.

(*Id.* at 43:20-44:2.) Ms. Nypl estimates that the Instructor pushed her team for "at least 10 [seconds]" because they went "several feet." (*Id.* at 46:24-25.) Ms. Nypl did not tell the Instructor to stop, nor did she hear Ms. Williams or Brian tell him to stop. (Dkt. No. 38-2, Ex. 6 at 168:6-23.)

Ms. Nypl "iced [her] shoulder" that evening, but participated in the remaining activities and "finished the class," which ended the following day. (*Id.* at 49:4-10.) She did not report the injury to the Instructors. (*Id*. at 47:16-19.)

### 2. Events According to Latonya D. Williams

Latonya Williams was a friend and coworker of Ms. Nypl's at Butte County for approximately 13 years. (Dkt. Nos. 38-2, Ex. 2 at 13:22-24 & 40-1, Ex. 2 at 23:9-10.) Ms. Williams is a Behavioral Health Worker and certified CPI instructor. (Dkt. No. 38-2, Ex. 2 at 14:21-25.) Ms. Williams attended the APT course with Ms. Nypl and Mr. Woodard in May 2014.

---

[4] CPI's reply in support of its motion to dismiss includes a portion of Ms. Nypl's deposition in which she is questioned whether the Instructor "pushed [them] because he said this is going to help your team." (Dkt. No. 40-1, Ex. 1 at 10:12-13.) In response, Ms. Nypl states, "Right. It could [help her team]." (*Id.* at 10:14.) Earlier in her deposition Ms. Nypl also states that she remembers the Instructor discussing the push either before or after the incident and saying that "it [could] help [her] team." (Dkt. No. 37-3, 46:5-12.)

5

Prior to attending, Ms. Williams discussed the APT course with Ms. Nypl and Mr. Woodard; the three decided to attend the APT course in part because their unit was "experiencing more drug-induced patients," and "stuff that [they] weren't equipped to deal with." (*Id.* at 16:20-17:12.)

At the time of Ms. Nypl's injury, the class participants were engaged in "team transport." (*Id.* at 27:18-19; 28:1-3.) The lead Instructor did not demonstrate how to conduct the transport hold prior to the exercise because that maneuver is taught "in the basic course, [and] everybody knew [the hold]." (*Id.* at 28:12-14). The participants, in teams of three, were instructed to "get [the mock patient] off the ground and transport them away." (*Id.* at 28:18-21.) Ms. Williams could not recall where the lead Instructor was exactly positioned when she, Ms. Nypl, and Brian ("her team") started the transport hold, but the Instructor was not near her team. (Dkt. No. 40-1, Ex. 2 at 25:2-7.) Ms. Williams and her team began the transport hold "were moving slow [because they] were close to a wall." (Dkt. 38-2, Ex. 2 at 30:24-25.) The team "had taken a couple steps" when the "second [I]nstructor began pushing Brian in the lower back." (Dkt. No. 40-1, Ex. 2 at 28:6-12.) As described by Ms. Williams:

> [T]he second Instructor came up behind us, and I can't remember exactly what he said, but he pushed – he had his two hands at Brian's lower back and he sped us up. He started, so we started walking faster.

(Dkt. No. 38-2, Ex. 2 at 31:2-6.) Ms. Williams took shorter steps to "slow it down." (Dkt. No. 40-1, Ex. 2 at 28:21-23.) As she describes it:

> Anyway, so we were moving pretty quickly and we were right at the wall, and I started to chop my steps. Brian had his – kicked his leg out and pushed off the wall. We were right there at the wall. And then we kind of we all jerked back.

(Dkt. No. 38-2, Ex. 2 at 31:15-19.) Ms. Williams estimates they took "eight, nine steps" when the Instructor pushed them, over a span of "a couple seconds." (*Id.* at 32:2-5.) Ms. Williams remembers saying, "Okay. Okay." while being pushed. (*Id.* at 32:6-8.) She also heard Brian say "whoa, okay, whoa, okay," during the incident. (*Id.* at 32:12:13.) The second Instructor also "was saying something" while pushing her team, but Ms. Williams could not recall what he said. (*Id.* at 32:17-19.) Had Brian not kicked the wall, Ms. Williams believes her team "would have hit the

6

wall." (*Id.* at 43:18-21.)

Ms. Williams saw Ms. Nypl "rotating her shoulder kind of," following the incident. (*Id.* at 37:3.) Ms. Williams was unhurt. (*Id.* at 35:16-17.) Following the push, the Instructor "turned and started talking to the class as a whole." (Dkt. No. 40-1, Ex. 2 at 27:5-9.) Ms. Williams does not remember what the Instructor said to the class. (*Id.* at 27:10-11.) The next day, Ms. Nypl told Ms. Williams that her shoulder hurt. (*Id.* at 39:18-21.)

### 3. Events According to Marshal T. Woodard

Marshal Woodard was a coworker of Ms. Nypl's at Butte County, and has been a certified CPI instructor for "at least twelve or thirteen years." (Dkt. No. 38-2, Ex. 3 at 56:19-20.) Mr. Woodard attended the May 2014 APT course with Ms. Nypl and Ms. Williams.

Mr. Woodard identified the Instructor who pushed Brian during the transport position exercise as "the original [I]nstructor."[5] (Dkt. No. 40-1, Ex. 3 at 34:22-23.) Prior to the transport position exercise, the Instructor told the participants "that he wanted to go as real as possible." (Dkt. No. 38-2, Ex. 3 at 66:7-20.) Mr. Woodard saw the Instructor "running behind and definitely pushing Brian forward with [Ms. Nypl and Ms. Williams] on the sides." (*Id.* at 61:13-16.) The Instructor was pushing the team towards the opposite wall. (*Id.* at 61:24-25.) Mr. Woodard next saw "Brian's feet up against the wall." (*Id.* at 62:3-6.) After the push, Mr. Woodard describes seeing the following:

> [Ms. Nypl was] on the side of Brian. Brian was turned upwards in a sitting squatting position with both feet on the wall which I didn't understand why that was necessary at that glance. And then I go back to what I was doing. The [I]nstructor was back, was not supporting Brian. He was – I would say a foot to three back. And that's what I observed.

(*Id.* at 62:11-18.) Mr. Woodard then observed:

> Brian . . . facing the [I]nstructor. [Ms. Nypl] was – had her arm over her shoulder and had her injured shoulder or arm out in front of her, and they were talking.

(*Id.* at 65:21-25.)

---

[5] As previously noted, Ms. Williams referred to this Instructor as the "lead instructor" or "first instructor."

7

#### 4. **Events According to Instructor John Hippe**

Mr. Hippe is a CPI Instructor with 17 years of experience; he was one of the two Instructors who conducted the May 2014 APT course. (Dkt. No. 38-2, Ex. 4 at 73:19-24, 85:6-21.) Mr. Hippe does not recall the incident at issue or teaching the transport position exercise, although he "was in the room the entire time." (*Id.* at 94:19-21-95:1-5, 104:18-105:3.) Mr. Hippe also does not recall any participants suffering injury during the course. (*Id.* at 105:4-9.)

#### 5. **Events According to Instructor Mark Nilsen**

Mr. Nilsen is a "global professional instructor" for CPI. (Dkt. No. 38-2, Ex. 5 at 133:1-3.) He taught the May 2014 APT course under the mentorship of Mr. Hippe. (*Id.* at 133:24-134:4.) Mr. Nilsen has a "foggy recollection" of the May 2014 course, noting that "there was nothing remarkable about that training that makes it stand out in [his] mind." (*Id.* at 135:19-24.)

### D. **Post-Injury**

Following the APT course, Ms. Nypl immediately experienced pain in her arm. (Dkt. No. 38-2, Ex. 6 at 172:2-12.) Her husband, Vladimir, encouraged her to seek medical attention. (*Id.*) She went to the doctor "shortly thereafter" and reported the incident to Butte County within "24 to 48 hours" after her return. (*Id.* at 172:15-19; 173:2-8.)

Ms. Nypl underwent the first of three surgeries in December 2014. (Dkt. No. 38-2, Ex. 6 at 156:2-4; 174:10-12.) She was diagnosed with "complex regional pain syndrome" between the second and third surgeries. (*Id.*) Ms. Nypl returned to work at Butte County for a "short period of time" before leaving in June or July of 2015. (*See id.* at 159:25-160:2); (*see also* Dkt. No. 37-3, Ex. B at 16:9-17:7.)

In July 2015, CPI employee Kathy Clark fielded a call from Ms. Nypl. (Dkt. No. 37-1 at 1.) Ms. Nypl explained to Ms. Clark that she could not complete her required teaching hours to meet CPI certification because "she got hurt" during the May 2014 training program. (*Id.* at 4.) Ms. Clark's contemporaneous notes from the call state, in part:

> Marissa mentioned they were doing a mock escort of a client and her partner may have panicked as they pushed forward with more speed into a wall. Practicing role play in line with more real time when events happen. At the end of day she assumed it was just muscle pain like everyone else who was feeling the same after all

8

> the physical training they did. Unfortunately Marissa actually sustained an injury during training – had surgery to have bicep re-attached. Out for 6 months – Marissa mentioned that she didn't call CPI previously to convey this information as everything was covered by workman's comp. She was mentioning it now because she thought we should know about it. She also stated "she's not blaming anyone as these things sometimes happen.["] Marissa tried to go back to work – did so for a month but was pulled off again due to the injury and concern by org towards further sustaining more damage. She indicated there is now a possibility that she will be facing another surgery. Presently, she [is] off work for an undetermined amount of time.

(*Id.*)

This lawsuit followed.

## DISCUSSION

### I. Negligence

Plaintiffs allege that CPI's negligence in the conduct of the transport position exercise caused Ms. Nypl's injury. CPI argues that it is entitled to summary judgment because: (1) Plaintiffs' negligence claim is barred by the primary assumption of risk doctrine; and (2) the signed Waiver releases CPI from all liability. While the Waiver cannot release CPI from liability for gross negligence, CPI insists that the evidence is insufficient to support a finding by a reasonable trier of fact of gross negligence, that is, "that CPI's conduct resulted in an extreme departure from the ordinary standard of conduct." (Dkt. No. 40 at 14.)

#### A. Primary Assumption of Risk

The doctrine of primary assumption of risk creates an exception to the general rule that all persons have a duty to use ordinary care to avoid injuring others. *Knight v. Jewett*, 3 Cal. 4th 296, 315 (1992) (citing Cal. Civ. Code § 1714). Primary assumption of risk arises in situations "where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury." *Id.* at 314-15. In those situations, "the doctrine continues to operate as a complete bar to the plaintiff's recovery." *Id.* at 315. "The overriding consideration in the application of primary assumption or risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature." *Saville v. Sierra Coll.*, 133 Cal. App. 4th 857, 867 (Cal. Ct. App. 2005) (internal quotation marks and citations omitted).

9

Assessing whether primary assumption of risk applies is "an objective test." *Id.* at 866. Application of the doctrine "does not depend on a particular plaintiff's subjective knowledge or appreciation of the potential risk." *Id.* If the doctrine otherwise applies, "a defendant is liable only if he intentionally injures the plaintiff or engages in conduct so reckless as to be totally outside the range of the ordinary activity in the sport or activity." *Id.* The Court must thus consider the nature of the APT course and CPI's relationship to that activity, and whether the Instructor's conduct was "totally outside the range of ordinary activity" inherent in the APT course.

### a. Nature of the APT Course and the Transport Hold

Every reasonable trier of fact would have to find that the nature of the activity at issue involves an inherent risk of bodily injury. There is no dispute that the APT course is an advanced, physically demanding training course designed to simulate interactions—including emergency situations—involving noncompliant psychiatric patients. There is no dispute that participants are warned in advance that the APT course involves a risk of physical injury. Further, and as discussed below, there is no dispute that the transport position is a maneuver used to secure a patient who is a risk to self or others and that it can be dangerous to apply. For these reasons, the nature of the activity suggests that the primary assumption of risk doctrine should apply here.

### b. Relationship of CPI to the Activity

"Duties regarding the same risk may differ depending on the role played by a particular defendant." *Saville*, 133 Cal. App. 4th at 870. Under California law, the "primary assumption of risk applies to instructors and coaches of activities except where the instructor has increased the risk inherent in the learning process." *Id.* To show that an instructor increased the risk, thereby negating the primary assumption of risk, a "plaintiff must prove the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's conduct was totally outside the range of the ordinary activity involved in teaching . . . [the activity]." *Id.* at 871 (internal quotation marks and citation omitted).

The only argument set forth by Plaintiffs in opposition to the primary assumption of risk is that the doctrine is inapplicable because the Instructor engaged in "reckless and grossly negligent

10

conduct . . . that was not inherent to the subject activity." (Dkt. No. 38 at 16.) The Court must therefore address whether the Instructor's act of pushing Ms. Nypl's team during the transport position exercise (a disputed fact the Court must resolve in Plaintiffs' favor on summary judgment) was "totally outside the range of the ordinary activity involved" in the APT course, *see Saville*, 133 Cal. App. 4th at 866. The Court cannot conclude as a matter of law that it was not.

The deposition testimony of Mr. Hippe, Mr. Nilsen, Ms. Williams, and Mr. Woodard—all certified CPI instructors who have taught the transport position many times—supports a finding by a reasonable trier of fact that the Instructor's pushing of the mock patient was not inherent to the APT course or the transport position exercise. Ms. Williams has taught the transport position in "at least 20 classes." She has never pushed a mock patient to speed up the process. (Dkt. No. 38-2, Ex. 2 at 40:22-41:18.) With the exception of the May 2014 APT course, Ms. Williams has never seen an instructor push anyone during the transport position exercise, nor has she been pushed since. (*Id.* at 47:13-48:3.)

Mr. Woodard has taught the transport position many times over the last 12 or 13 years. (Dkt. No. 38-2, Ex. 3 at 57:15-24.) He has never instructed someone to push the individuals performing the transport position. (*Id.* at 58:21-25.) Mr. Woodard instructs participants to lower the patient to the ground if they become noncompliant and violent, (*Id.* at 60:19-25) or "start[ ] to escalate where they're running," (Dkt. No. 40-1, Ex. 3 at 36:19-25).

As of May 2014, Mr. Hippe had taught roughly "six to ten" APT courses per year since 2002. (Dkt. No. 38-2, Ex. 4 at 92:15-25.) CPI's ground rules for course instructors and participants include "responsibility for the safety of others." (*Id.* at 94:9-18.) Further, CPI instructors practice "safe realism," that is, making sure that instruction is "safe enough to prevent harm but real enough to promote learning." (*Id.* at 114:6-15.) Pushing an individual during instruction of the transport position is "not something that [Mr. Hippe] would expect to have happen" during training, nor is it something he has personally done or witnessed. (*Id.* at 115:23-116:6, 119:7-120:16.)

Like Mr. Hippe, Mr. Nilsen is familiar with CPI's due care rules for participants and instructors. (Dkt. No. 38-2, Ex. 5 at 137:14-138:20.) Mr. Nilsen is also familiar with CPI's "safe

11

realism" teaching concept. (*Id.* at 138:21-139:5.) Furthermore, Mr. Nilsen has never pushed a participant during the transport position exercise, nor would he recommend doing so because it would be unsafe. (*Id.* at 145:5-148:15.)

The testimony of Mr. Hippe and Mr. Nilsen alone raises a triable issue of material fact because it supports a finding that the Instructor who pushed Ms. Nypl's team failed to comply with CPI training principles and standard teaching methods for the transport position. Mr. Hippe and Mr. Nilsen were the only two Instructors conducting the APT course, and both testified that they would never push a participant during instruction of the transport position because it would be unsafe. Indeed, there is no evidence in the record suggesting that pushing the mock patient into a wall—with any amount of force—during the transport position exercise is something any instructor would ever do, or that such a training technique, if it exists, would simulate a situation that an employee might encounter. Therefore, construing the record in the light most favorable to Plaintiffs, a reasonable trier-of-fact could find that the Instructor's conduct "was totally outside the range of ordinary activity involved in teaching the maneuver." *See Saville*, 133 Cal. App. 4th at 871. To put it another way, success on Plaintiffs' claim will not lead to a chilling of vigorous participation in the teaching of the transport position exercise given that there is no evidence that any instructor would ever teach what is alleged to have occurred.

In *Saville*, the plaintiff complained that he was injured by the defendant's negligence during "takedown maneuvers" taught as part of a law enforcement training class. *Id.* at 864. The record was undisputed that the takedown activity was a required component of the class, and the takedown maneuver could not be taught and eventually learned by peace officers without incurring a risk of injury. Thus, "[e]liminating the risk of injury inherent in the maneuvers would require eliminating the maneuvers from class." *Id.* at 868. Here, in contrast, while the transport position exercise includes a risk of injury, the risk of injury from the mock patient being pushed against the wall (how Ms. Nypl alleges she was injured) can be eliminated without eliminating the transport position exercise since on this record it is undisputed that pushing the mock patient is never part of the transport position exercise.

CPI's reliance on *Hamilton v. Martinelli & Associates*, 110 Cal. App. 4th 1012, 1023 (Cal.

Ct. App. 2003), while understandable, ultimately fails to persuade the Court that the primary assumption of risk doctrine applies to this record. The plaintiff in *Hamilton* worked as a juvenile probation corrections officer and sustained "injuries to her neck and back while performing a training maneuver" during a required training course in "Unarmed Defensive Tactics" ("UDT"). *Id.* at 1016. The plaintiff brought suit against the instructor and his employer alleging personal injuries based on negligence and intentional tort. *Id.* The trial court entered summary judgment in favor of the defendants concluding that the plaintiff failed "to show that the maneuver was so violent or dangerous as to be outside the category of the training exercise," and that there was "no evidence that defendant[s] exceeded the boundaries of the normal risks associated with this type of training." *Id.* at 1016-17. Plaintiff appealed, arguing in part that there were "triable issues of fact concerning whether defendants increased the risk of harm associated with the UDT training maneuver, and intentionally caused her injuries." *Id.* at 1017.

The appellate court affirmed, concluding that "Plaintiff's neck and back injuries were an inherent risk of performing the UDT training maneuver." *Id.* at 1023. In doing so, the court rejected the plaintiff's expert declaration that the "UDT training maneuvers were 'unnecessary and inappropriate in the context of mandatory training.'" *Id.* at 1019. The court reasoned that the expert's statements "are merely critical of the Department's policy of requiring plaintiff to learn UDT training maneuvers. They do not address whether the risk of physical injury to plaintiff is rooted in the 'very occasion' of her employment." *Id.* at 1024. In other words, there was no dispute that the UDT maneuver, which was used to physically restrain juveniles, was "a necessary tool in plaintiff's employment." *Id.* Thus, the expert's declaration merely created a dispute as to whether the UDT maneuver should be taught as part of the mandatory training, not whether the maneuver and its inherent risks were part of the plaintiff's employment. Here, in contrast, there is no evidence that having a third party push a patient being transported by two employees simulates a risk rooted in the very occasion of Ms. Nypl's employment. This lack of evidence no doubt stems from the fact that, unlike in *Hamilton* where the defendant instructor admitted he engaged in the maneuver, here the instructors deny that the maneuver (the pushing of the patient or the entire transport team) was performed or would ever be performed.

Construing all evidence in the light most favorable to Plaintiffs, a reasonable trier-of-fact could find that the Instructor's conduct was a total departure from the ordinary activity inherent in the transport position exercise and Ms. Nypl's employment. Thus, there is a genuine dispute as to whether the primary assumption of risk doctrine applies and negates CPI's duty to Ms. Nypl.

### 2. Waiver

Under California law, "parties may contract for the release of liability for future ordinary negligence so long as contracts do not violate public policy." *Anderson v. Fitness Int'l, LLC*, 4 Cal. App. 5th 867, 877 (Cal. Ct. App. 2016). A valid waiver cannot, however, release a defendant from liability for gross negligence. *City of Santa Barbara*, 41 Cal. 4th 747, 750-51 (2007). Where the presence of a valid waiver is undisputed, the party opposing its application bears the burden of showing a triable issue of material fact regarding gross negligence. *Anderson*, 4 Cal. App. 5th at 877-78.

Plaintiffs do not dispute that there is a valid, signed waiver releasing CPI from liability for ordinary negligence. (*See* Dkt. No. 38 at 18-19) ("The law is clear that contractual assumption of the risk doctrine asserted through a valid waiver of liability may exculpate [CPI's] responsibility for [Ms. Nypl's] harm unless [CPI] was grossly negligent or intentionally harmed [Ms. Nypl]."). Thus, Plaintiffs bear the burden of demonstrating a triable issue of material fact on gross negligence. Plaintiffs have met this burden.[6]

A plaintiff alleging gross negligence must prove that a defendant's actions constituted a complete lack of due care "or an extreme departure from the ordinary standard of conduct." *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (Cal. Ct. App. 2011) (internal quotation marks and citation omitted). "Generally, it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence," and the record here supports that

---

[6] California courts do not recognize a separate cause of action for gross negligence. *See City of Santa Barbara v. Superior Court*, 41 Cal. 4th at 779-80 ("We do not view our holding . . . as recognizing a cause of action for gross negligence."); *see also Saenz v. Whitewater Voyages, Inc.*, 226 Cal. App. 3d 758, 766 n.9 (Cal. Ct. App. 1990) ("California does not recognize a distinct cause of action for 'gross negligence" independent of a statutory basis."). Thus, there is no reason for Plaintiffs to seek leave to amend to allege gross negligence; the question on summary judgment is whether the evidence is sufficient to support a finding of gross negligence.

14

general approach. *See Chavez v. 24 Hour Fitness USA, Inc.*, 238 Cal. App. 4th 632, 640 (Cal. Ct. App. 2015). Drawing all inferences in favor of Plaintiffs, the deposition testimony discussed above gives rise to a triable issue of fact as to whether the Instructor's conduct was an extreme departure from ordinary instruction methods in teaching the transport position. Simply put, CPI presents *no* countervailing evidence that the Instructor's push was *not* outside the ordinary standard of conduct. Thus, on summary judgment the Court cannot conclude as a matter of law that the Instructor's conduct was not grossly negligent.

## II. Loss of Consortium

CPI argues that it is entitled to summary judgment on Mr. Nypl's loss of consortium claim. A loss of consortium claim "stands or falls based on whether the spouse of the party alleging loss of consortium has suffered an actionable tortious injury." *Hahn v. Mirda*, 147 Cal. App. 4th 740, 746 (Cal. Ct. App. 2007); *see also Rodriguez v. Bethlehem Steel Corp.*, 12 Cal. 3d 382, 408 (1974) (holding "that in California each spouse has a cause of action for loss of consortium, as defined herein, caused by *negligent or intentional injury* to the other spouse by a third party.") (emphasis added). Because Plaintiffs have demonstrated a genuine dispute as to material fact both as to whether the primary assumption of risk applies and whether the Instructor's conduct constituted gross negligence, the Court denies CPI's motion for summary judgment on Mr. Nypl's loss of consortium claim.

**EVIDENTIARY OBJECTIONS**

CPI objects to the declaration of Plaintiffs' counsel, Joseph A. Welch, (Dkt. No. 38-2), on the grounds that it "relies on unauthenticated deposition testimony." (Dkt. No. 40 at 5.) CPI argues that the deposition transcripts attached as exhibits 2-5 to the Welch declaration are inadmissible for lack of authentication because the transcripts do not include the signed certificate of the reporter who took the deposition.[7] CPI's argument is moot given the supplemental

---

[7] CPI does not object to the deposition testimony of Marissa Nypl on the grounds that it lacks authentication, because CPI "previously submitted the court reporter certificate from Marissa's deposition in connection with CPI's motion for summary judgment." (Dkt. No. 40-1 at ¶ 3); *see also Orr v. Bank of America, NT & SA*, 285 F.3d 764, 775 (9th Cir. 2002) (holding that "when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties"). The declaration of Brian Slome, submitted by CPI in

15

declaration of Mr. Welch filed on August 20, 2018, which includes as exhibits the signed reporter's certificates for the deposition transcripts previously submitted by Mr. Welch. (*See* Dkt. No. 41.)

CPI also objects to portions of the deposition testimony of Ms. Nypl, Ms. Williams, Mr. Woodard and Mr. Hippe. Even without that testimony, however, there would still be a genuine issue of material fact because the Instructors both testified that they did not push and have never pushed the mock patient during a transport position exercise. Accordingly, these objections are also moot.

## CONCLUSION

CPI has not met its burden and shown that it is entitled to judgment as a matter of law under either the primary assumption of risk doctrine or waiver, and Plaintiff has demonstrated a genuine dispute of material fact as to both. Accordingly, the Court denies CPI's motion for summary judgment.

This Order disposes of Docket No. 37.

**IT IS SO ORDERED.**

Dated: September 17, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

---

support of its motion to dismiss, includes additional pages of Ms. Nypl's deposition transcript and requests the Court to consider those pages, "in rebuttal." (*Id.* at ¶ 4.) The Court does so here.

16